UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| KELSEY R. WOOD, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No.: 3:14-CV-115-TAV-HBG |
| TECHNOLOGY FOR ENERGY CORPORATION, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action is before the Court on Technology for Energy Corporation's Motion for Summary Judgment [Doc. 12]. Plaintiff filed a response in opposition [Doc. 17], and defendant replied [Doc. 19]. After careful consideration of the record and the law, the Court will grant the motion for summary judgment.

I. **Background**

Defendant Technology for Energy Corporation designs and manufactures diagnostic instruments for four industries: aviation, electric power, material testing, and nuclear [Doc. 13-1 p. 41]. The company formed its aviation division in 1990, following its acquisition of ACES Systems [*Id.*]. Defendant designs, manufactures, and sells ACES Systems products within the United States and internationally [*Id.*].

Plaintiff began working for defendant as a Product Support Coordinator in November 2010 [*Id.* at 42]. As a Product Support Coordinator, her job responsibilities included initiating and coordinating all records and activities relating to aviation product

repairs and/or re-calibrations [*Id.*]. Her annual salary was $29,120 and she earned commissions and bonuses [*Id.*].

On July 25, 2011, defendant offered plaintiff the position of Regional Sales Coordinator within the aviation division [*Id.* at 21, 29]. According to plaintiff, the job duties of this position varied from that of Product Support Coordinator; as a Regional Sales Coordinator, she was more "sales focused" [*Id.* at 23]. She also was responsible for getting leads, quoting and selling customers, and making follow-up calls [*Id.* at 12]. Plaintiff worked as a Regional Sales Coordinator from September 1, 2011, through her termination on June 14, 2013 [*Id.*]. Her annual salary was $35,016, plus commissions and bonuses [*Id.* at 21, 42].

William "Buddy" Simpkins set plaintiff's salary [*Id.* at 42]. Simpkins set the salary by using Ron Smith's starting salary of $33,000 as a benchmark; Smith began as a Regional Sales Coordinator in 2000 [*Id.*]. Simpkins also considered plaintiff's skill level, the fact that salaries had been pretty flat since 2000, slow economic conditions in the market, the health of the company, and the risk of hiring a person who has not been proven in the field [*Id.*]. At the time plaintiff began as a Regional Sales Coordinator, Smith's salary was $59,200, and his salary remained the same through plaintiff's termination date [*Id.*]. Prior to working as a Regional Sales Coordinator, Smith served approximately twenty years in the United States Air Force ("USAF") [*Id.* at 36]. While in the USAF, Smith worked approximately five years in aircraft maintenance and the balance of his career was in recruitment and sales [*Id.*].

2

Eric Hale was also an employee of defendant [Doc. 13-1 at 5]. His starting salary was $21,600 [*Id.* at 42]. He initially worked as an inside sales supervisor within an industrial product sales group, but he helped start defendant's aviation division in 1990 [*Id.* at 37–38]. Then, he worked in sales and performed the same job responsibilities as a Regional Sales Coordinator until he resigned on or about January 21, 2000, to pursue another job opportunity [*Id.* at 42]. At the time of his resignation, his salary was $50,000 [*Id.*]. Hale returned to be a Regional Sales Coordinator in 2006, with a salary of $50,000 [*Id.* at 37–38]. Simpkins explains that his salary accounted for his prior experience with defendant and the fact that he was the most effective sales person within the aviation division at the time he resigned [*Id.* at 42]. When plaintiff began as a Regional Sales Coordinator in September 2011, Hale's salary was $56,300 [*Id.* at 42–43]. His salary was the same on the date of plaintiff's termination [*Id.*].

Plaintiff does not contest that Smith and Hale had more experience in the Regional Sales Coordinator position than did plaintiff [*Id.* at 6]. Indeed, the two, Smith and Hale, generated more sales and higher sales revenue than plaintiff [*Id.* at 43]. From September 2011 through June 2013, the sales numbers for Smith, Hale, and plaintiff were $3,175,572, $2,977,162, and $1,380,277, respectively [*Id.*]. And over the same time period, the three respectively had 795, 958, and 715 customer orders [*Id.*]. The three also respectively had 5,294, 5,299, and 1,261 customer contacts, and according to historical data, a higher the number of customer contacts correlated with a higher number of sales

3

[*Id.*].  Finally, the three respectively had 411, 541, and 289 customer quotes from the same period [*Id.*].

On two occasions, plaintiff's supervisor, Larry Lehman, counseled plaintiff so that she could increase her sales production [*Id.* at 14–15].  On or about April 30, 2013, Lehman placed plaintiff on a Production Improvement Plan, which was designed to raise her sales numbers [*Id.* at 24, 30–31].  Neither Smith nor Hale were placed on a Production Improvement Plan [*Id.* at 44].

During the time plaintiff was a Regional Sales Coordinator, defendant maintained two different commission plans [*Id.*].  From January 1, 2012, until January 31, 2013, one hundred percent of all earned commissions were pooled together and paid in equal shares to the three Regional Sales Coordinators [*Id.*].  From February 1, 2013, until July 1, 2013, eighty percent of the earned commissions were pooled together and paid in equal shares to the Regional Sales Coordinators, but the remaining twenty percent of earned commissions were paid to those responsible for generating the sales resulting in the commissions [*Id.*].  After plaintiff's termination, defendant modified the commission plan so that seventy percent of the earned commissions were pooled together and paid in equal shares to the Regional Sales Coordinators, but the remaining thirty percent of earned commissions were paid to those responsible for generating the sales resulting in the commissions [*Id.*].  Defendant implemented each of these plans to increase sales [*Id.* at 45].

## II.   Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the

5

evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III. Analysis

Plaintiff claims defendant violated her rights under the Equal Pay Act ("EPA"), 29 U.S.C. § 206, *et seq.*, the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, *et seq.*, and Tenn. Code Ann. § 50-2-202 because it paid her a salary and bonuses less than the male Regional Sales Coordinators, Smith and Hale [Doc. 1 ¶ 14]. She also claims she was discriminated against because defendant changed its commission plan [*Id.* ¶ 18]. With respect to the latter argument, it appears plaintiff has abandoned this claim under the Tennessee Human Rights Act [*See* Doc. 17 n.1; Doc. 19 p. 3].

#### A. Equal Pay Act

To establish a *prima facie* case of wage discrimination under the EPA, a plaintiff must demonstrate that the employer paid employees of the opposite sex different wages for equal work or for jobs the performance of which requires equal skill, effort, and responsibility or are performed under similar working conditions. *Beck–Wilson v.*

6

*Principi*, 441 F.3d 353, 359 (6th Cir. 2006). Here, there is no dispute for purposes of summary judgment that plaintiff has established a *prima facie* case [Doc. 19 p. 8].

Given there is a presumption that plaintiff has established a *prima facie* case of wage discrimination, defendant must prove that the pay differential is due to one or more of four statutory affirmative defenses: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citation omitted). Defendant is entitled to summary judgment on one of the affirmative defenses "'only if the record shows that [it] established the defense so clearly that no rational jury could have found to the contrary.'" *Id.* at 800 (quoting *Equal Emp't Opportunity Comm'n v. State of Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1414 (3d Cir. 1989)). "Because these nongender-based explanations for the wage differential are affirmative defenses, the defendant bears the burden of proof." *Id.* (footnote and citation omitted). This is in contrast to the burden-shifting approach in Title VII cases. *Id.* at 799 n.6. If defendant proves one of the affirmative defenses, then plaintiff has a burden of production to demonstrate that the reasons for the pay differential are pretexual. *Balmer v. HCA, Inc.*, 423 F.3d 606, 613 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice,* —— U.S. ——, 131 S. Ct. 2205 (2011).

Plaintiff seems to argue she was not paid an equal wage in three respects: her starting salary as a Regional Sales Coordinator, her salary during her tenure as a Regional

7

Sales Coordinator, and the bonus and commission she earned as a Regional Sales Coordinator. The Court considers these arguments in turn.

### 1. Starting Salary

Plaintiff argues defendant improperly paid her a starting salary less than her male counterparts, specifically Smith. But the Court finds defendant has put forward evidence that shows defendant used factors other than sex in determining plaintiff's starting salary as a Regional Sales Coordinator, and that no rational jury could find to the contrary.

Defendant asserts Simpkins examined plaintiff's skills, Smith's starting salary, market conditions, and the health of the company in determining plaintiff's starting salary. The Court finds these were all "factors other than sex" defendant could use in determining plaintiff's salary.

First, an employer may consider skill and experience in determining salary. *See Foco v. Freuenberg-Nok Gen. P'ship*, 549 F. App'x 340, 346 (6th Cir. 2013) ("Pay differentials based on experience, overall qualifications and skill levels are legitimate 'factors other than sex.'" (citation omitted)); *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 107 (6th Cir. 2006) (affirming summary judgment where employer considered "not only prior salaries but also skills and experience that were of value to the company"). Indeed, the Sixth Circuit has specifically held that the amount of relevant work experience is a "factor other than sex" that justifies starting wage differentials between male and female employees. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 486 (6th Cir. 2011) (noting, that comparison of male employee's

8

nine months of prior experience with female employees' prior experience of between five and ten years was a "factor other than sex" that justified pay differential).

Plaintiff argues she actually had greater skills and experience than Smith at the time Smith began as a Regional Sales Coordinator, and thus defendant's argument for the pay differential is pretextual. She asserts Smith never previously worked for defendant, knew nothing about defendant's products, did not have a college degree, never studied for his Airframe and Power Plan Mechanic certificate, and did not have aviation sales experience. Conversely, plaintiff asserts she had all of these qualities when she was hired as a Regional Sales Coordinator—she had previous aviation sales experience, she had a B.S. degree, she had been employed by defendant, and she had product knowledge. As defendant points out, plaintiff cites no evidentiary support for her conclusory assertion about her skill level in comparison to Smith's skill level, as she is required to do under Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure. Even so, the Court finds that defendant has submitted proof substantiating its position regarding the relative skill and experience and does not find plaintiff's argument persuasive in establishing pretext. And the Court recognizes that it is not "to serve as [a] personnel manager[.]" *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005).

Second, an employer may consider market conditions and the health of the company when setting salaries, and Simpkins testified that he considered the market and the health of his company at the time he set plaintiff's salary [Doc. 19-1 p. 17–18]. *See Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 801 (S.D. Ohio 1998) ("Unequal wages

9

that reflect market conditions of supply and demand are not prohibited under the Equal Pay Act." (citing *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994))). Plaintiff asserts that defendant's financial performance was at a peak when Simpkins set plaintiff's salary in 2011, so her starting salary should have been higher. Yet, Simpkins's testimony does not entirely support this point, as he testified that sales spiked in 2011 or 2012 and that stimulus funds and tax rules relating to accelerated depreciation may have played a role in the total sales figures during the growth phase [*Id.* at 11].

While plaintiff's starting salary was in fact higher than Smith's starting salary, plaintiff argues that the fact Simpkins did not consider anything about the economy, inflation, national incomes, wage surveys or anything else, including a salary comparison calculator, which would have indicated that Smith's starting salary of $33,000 in 2000 is the equivalent of $43,106.78 in 2011, is evidence of pretext. But Simpkins testified that he "would have known that salaries have been pretty flat since 2000" and that "inflation would have been a big factor" [*Id.* at 17–18]. And when Simpkins set Hale's salary in 2006, he used the same salary that Hale earned when he resigned in January 2000 [*Id.* at 13–14]. Plaintiff even recognizes defendant's assessments need not be correct, so long as they are unrelated to gender [Doc. 17 p. 11].

In addition, plaintiff argues that in setting her $35,000 starting salary, Simpkins overruled the hiring manager, who had recommended plaintiff's salary be $39,000 to $40,000, and such establishes pretext. The Court cannot agree, as the evidence demonstrates that Simpkins took many "factors other than sex" into account when setting

10

plaintiff's starting salary. Moreover, the mere rejection of the hiring manager's recommendation is not, itself, evidence that the reasons for the pay differential are pretextual.

Finally, plaintiff makes several other pretext arguments, including some about defendant's human resources department and processes, but the Court does not find that any of them demonstrate the reasons for the pay differential are pretexual.

Thus with respect to plaintiff's starting salary, the Court finds defendant has clearly established an affirmative defense. It further finds plaintiff's contentions do not identify a genuine dispute of material fact that defendant's explanation of the pay differential between her starting salary and Smith's starting salary is pretextual.

### 2. Salary During Tenure as Regional Sales Coordinator

Plaintiff argues that defendant violated the EPA by paying the male Regional Sales Coordinators higher base salaries for the duration of plaintiff's tenure as a Regional Sales Coordinator. As an initial matter, the Court recognizes that, like plaintiff's salary, the salaries of Smith and Hale remained stagnant for the duration of plaintiff's tenure as a Regional Sales Coordinator. And to the extent plaintiff is claiming she should have received a salary increase, defendant has clearly demonstrated, as explained below, that a factor other than sex—job performance—was the reason for any continued wage disparity between plaintiff and Smith and Hale.

11

### 3. Bonus and Commission

Plaintiff argues that her bonuses were less than Smith's and Hale's bonuses, and the disparity violates the EPA. She particularly focuses on a bonus of $200 at the end of 2012, when Smith's bonus was $4,000 and Hale's bonus was $2,400 [Doc. 17 p. 13–14]. Plaintiff argues, in part, that her poor performance cannot justify this disparity because Simpkins testified that plaintiff did not start performing poorly until late 2012 or early 2013 and that it takes time for a Regional Sales Coordinator to build sales [*Id.* at 14–16].

But the Court finds defendant has put forward evidence that shows defendant used a "factor other than sex" to determine the Regional Sales Coordinators' bonuses, and that no rational jury could find to the contrary. Specifically, plaintiff received a lesser bonus than her male counterparts because her performance was not as strong as their performance. For the bonus year October 1, 2011, to September 30, 2012—plaintiff's first year as a Regional Sales Coordinator—Smith, Hale, and plaintiff booked sales totaling approximately $2.4 million, $1.7 million, and $670,000, respectively [Doc. 19-1 p. 27]. During the same time period, the three respectively logged 2,817, 2,759, and 750 customer contacts [*Id.*].

Although plaintiff conceded that it would be unfair to have paid plaintiff a higher bonus [Doc. 13-1 p. 25], plaintiff argues this explanation for her reduced bonus is pretext because defendant recognized that her numbers would be low at first and that her performance would improve over time. Further, Simpkins testified that plaintiff's performance problems began at the end of 2012 at the earliest. The Court does not find

12

this sufficient to raise a genuine issue of material fact that the reason for the lower bonus is pretextual, as plaintiff's figures for the relevant time frame demonstrate plaintiff was, in fact, performing at a lower level than her male counterparts. The fact that Simpkins, who was not in charge of setting the disputed bonus [Doc. 19 p. 20], became aware of her issues at a later date does not alter this fact. Also, the Court notes in April 2013, plaintiff was placed on a production improvement plan, the purpose of which was designed to improve plaintiff's sales [Doc. 13-1 p. 30].

To the extent plaintiff asserts that defendant changed the commission structure in 2013 to pay plaintiff less than her male counterparts, defendant has demonstrated that the change was made to increase sales, which is a "factor other than sex" [Doc. 12-1 p. 44–45]. Moreover, defendant changed the bonus structure in a similar manner again after plaintiff's termination, which suggests that the change in 2013 was in no way related to gender [*Id.*].

Thus with respect to plaintiff's bonus and commission, the Court finds that defendant has clearly established an affirmative defense. It further finds that plaintiff's contentions do not identify a genuine dispute of material fact that defendant's explanation of the pay differential is pretextual.

B. **Tennessee Human Rights Act and Tenn. Code Ann. § 50-2-202**

While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state-law claims, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on

13

Case 3:14-cv-00115-TAV-HBG   Document 23   Filed 05/14/15   Page 13 of 14   PageID #: 408

summary judgment." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001); *see also Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006). Thus, pursuant to § 1367(c), in the exercise of its discretion and in the interests of comity, the Court will decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff's remaining state-law claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725–26 (1966); *Brandenburg*, 253 F.3d at 900.

## IV. Conclusion

For the reasons set forth herein, the Court finds defendant has clearly established an affirmative defense to plaintiff's EPA claims. It further finds plaintiff's contentions do not identify a genuine dispute of material fact that defendant's explanation of the pay differential between plaintiff and her male counterparts is pretextual. The Court will therefore **GRANT** Technology for Energy Corporation's Motion for Summary Judgment [Doc. 12] and **DISMISS** this action. The Clerk of Court will be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE